UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MICHELLE K., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-1295-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Michelle K. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 11).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 6, 7. Plaintiff also filed a reply brief. *See* ECF No. 8. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 6) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 7) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed an application for DIB on March 20, 2019, alleging disability beginning March 28, 2019 (the disability onset date), due to (among other things) depression, anxiety, back injury, fibromyalgia, and chronic pain syndrome. Transcript ("Tr.") 13, 203-04, 224. Plaintiff's claim was denied initially on August 14, 2019, and upon reconsideration on December 12, 2019, after which she requested an administrative hearing. Tr. 13. On November 24, 2020,

Administrative Law Judge Paul Kelly ("the ALJ") conducted a conducted a telephonic hearing,[1] at which Plaintiff appeared and testified and was represented by Kenneth R. Hiller, an attorney *Id*. Allison Shipp, an impartial vocational expert, also appeared and testified at the hearing. *Id*. Following the hearing, the ALJ obtained testimony via interrogatory from Victoria Reid, Ph.D. ("Dr. Reid"), an impartial psychological expert. *Id*. The ALJ stated that the interrogatory (Tr. 1394-1403) was proffered to Plaintiff's attorney on March 15, 2021, but he did not respond. *Id*.

The ALJ issued an unfavorable decision on May 11, 2021, finding that Plaintiff was not disabled. Tr. 10-28. On October 26, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's May 11, 2021 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

---

[1] Due to the extraordinary circumstance presented by the Coronavirus Disease 2019 ("COVID-19") pandemic, all participants attended the hearing by telephone. Tr. 13.

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual

functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his May 11, 2021 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since March 28, 2019, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, headaches, chronic pain syndrome and myalgia, obesity, asthma, affective disorder, anxiety disorder, alcohol use disorder, and histories of Wolff-Parkinson-White syndrome and vasovagal syncope (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)[2] except she can lift up to 10 pounds occasionally; can stand and walk for about two hours and sit up to eight hours with normal breaks during an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; should avoid exposure to excessive vibration or noise; must avoid all exposure to unprotected heights and dangerous machinery; and is limited to simple routine tasks and "low stress" work environments defined as involving only occasional decision[-]making or changes in work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

---

[2] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.

7. The claimant was born on February 26, 1975 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 28, 2019, through the date of this decision (20 CFR 404.1520(g)).

Tr. 13-28.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on March 20, 2019, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 28.

## ANALYSIS

Plaintiff asserts a single (though multi-pronged) point of error challenging the ALJ's mental RFC finding.[3] Plaintiff argues that the ALJ improperly relied on the opinions of state agency reviewing consultants S. Juriga, Ph.D. ("Dr. Juriga"), and V. Ng, Ph.D. ("Dr. Ng"), and reviewing medical expert Dr. Reid. *See* ECF No. 12-14. Plaintiff asserts that the opinions of Drs. Juriga, Ng, and Reid incompletely and incorrectly characterized the evidence in the record and

---

[3] The Court notes that Plaintiff only challenges the ALJ's findings related to her mental impairments. *See generally* ECF No. 6-1. Accordingly, the Court declines to address the ALJ's physical RFC finding in this opinion. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal); *Patterson v. Saul*, No. 19-CV-465-LGF, 2020 WL 5642187, at *4 (W.D.N.Y. Sept. 22, 2020) (because plaintiff's contentions were limited to the ALJ's treatment of mental impairments, any challenge to the ALJ's consideration of physical impairments was waived) (citing *Glover v. Saul*, 2020 WL 90768, at * 5 (W.D.N.Y. Jan. 8, 2020)); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

ignored findings that were favorable to Plaintiff. *Id*. at 12, 16.  Therefore, argues Plaintiff, "it was incumbent upon the ALJ to develop the record with a functional medical opinion from a treating or examining source." *Id*. at 14.

In response, the Commissioner argues that the ALJ was not required to base his decision on any opinion, whether from an examining physician, or any other physician, and the ALJ's RFC finding was supported by substantial evidence, including the opinions of Drs. Juriga, Ng, and Reid, as well as Plaintiff's treatment notes and activities of daily living. *See* ECF No. 7-1 at 8-21. The Commissioner further argues that the ALJ reasonably determined that he had sufficient evidence upon which to make a decision and was not required to develop the record any further. *See id*. at 21-24.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review, the Court finds that the ALJ's mental RFC finding was supported by substantial evidence, including the opinion evidence, Plaintiff's treatment notes showing modest or normal examination findings and an improvement in her mental health symptoms with treatment, and her activities of daily living, which included working, performing household chores, driving, and socializing with others. Furthermore, the Court finds that the ALJ satisfied his duty to develop the record by holding the record open after the hearing and considering the additional evidence submitted after the hearing. *See* Tr. 1278-1283, 1284-1380. Accordingly, the Court finds no error.

The record reflects that Plaintiff treated with Suburban Psychiatric Associates ("Suburban") from April 6, 2017, to May 31, 2017. Tr. 805-26. She reported depression, status post 2015 traumatic brain injury, and worsening anxiety since childhood, for which she was assessed with unspecified anxiety and bipolar disorders.  Tr. 807. Mental status notes during initial evaluation recorded apparent "moderate" distress, anxious mood and affect, over-productive and spontaneous speech with tearfulness, and "decreased" attention and concentration.  Tr. 809. However, Plaintiff was appropriately groomed, alert and oriented with fair eye contact, normal psychomotor activity, "adequate" or "fair" memory, and no evidence of pressured or rapid speech. *Id*. Similar findings were observed during her three follow-up appointments in May, at which time Plaintiff reported medication had helped after she transitioned to Pristiq from Cymbalta. Tr. 811-12, 814, 817. It appears that Plaintiff did not continue care with Suburban after May 2017. *See* Tr. 805-26.

On October 26, 2017, Plaintiff presented to Horatio Capote, M.D. ("Dr. Capote"), at DENT Neurologic Institute ("DENT"), for an initial psychiatric consultation. Tr. 561-65. Plaintiff reported she was suffering from "long-standing treatment resistant depression," which she believed was triggered years by a traumatic brain injury ("TBI") with multiple concussions and subsequent chronic pain. Tr. 562. She described "brain fog and sadness for about three years now" and stated she lost her job in April due to attendance issues. *Id*. She reported various treatments with a variety of different providers, including treatment at Suburban, and treatment with various psychiatric medications without efficacy. *Id*. Dr. Capote recommended electroconvulsive therapy ("ECT") and indicated that he would initiate the process to obtain approval. Tr. 564.

On December 21, 2018, Plaintiff presented to Hope Treatment Center, complaining of stressors regarding family, finances, and employment issues.  Tr. 462-63, 468. She reported having no history of counseling, instead only psychiatric care, and stated she wished to start counseling.

Tr. 468. Other than "restless" motor activity, mental status findings were within normal limits for appearance, thoughts, hygiene, attention, concentration, speech, and memory. Tr. 474-76. She was assessed with recurrent major depressive disorder. Tr. 484. Plaintiff attended two sessions after her initial intake, and on February 18, 2019, she was "lost to contact" and discharged. Tr. 485.

On March 28, 2019, Plaintiff presented to physician assistant Michael Asbach, PA-C, Psych CAQ (certified additional qualification in psychology) ("Mr. Asbach"), at DENT, for psychiatric consultation and treatment for depression, difficulty functioning, and sleep issues. Tr. 658-61. Plaintiff reported "significant functional impairment" due to depression, including "brain fog and sadness." Tr. 658. She also reported that for the past few months she had been experiencing "strange noises," which included "hear[ing] murmuring or other non-distinguishable voices" when her "depression becomes very severe and debilitating." *Id*. Plaintiff stated that she had previously treated at DENT in 2017, and ECT (electroconvulsive therapy) was recommended, but she "got cold feet." *Id*.

On mental status examination ("MSE"), Plaintiff had a depressed mood, diminished concentration, and fair judgment. Tr. 660. Mr. Asbach noted clear and coherent speech, goal directed thought processes, and no evidence of any hallucination or delusion. *Id*. She was diagnosed with major depressive disorder, recurrent, severe, with psychosis and generalized anxiety disorder, and noted to have attendant physical diagnoses of sleep apnea, obesity, history of concussion, and fibromyalgia. *Id*. Mr. Asbach stated that Plaintiff remained an excellent candidate for ECT. *Id*. He noted that Plaintiff underwent neurodiagnostic imaging in 2019, and after reviewing those results, he determined that no further neuroimaging was necessary before starting ECT. *Id*. He prescribed Olanzapine 7.5 mg and ordered lab work to evaluate any comorbid conditions. *Id*.

On April 7, 2019, Plaintiff established care with primary care physician ("PCP") Mary Katherine Kolbert, M.D.  ("Dr.  Kolbert"), at Buffalo Medical Group ("BMG"). Tr. 670-72. Dr. Kolbert noted that Plaintiff was not new to her as she had previously been a patient at Dr. Kolbert's prior practice. Tr. 671. Plaintiff reported that her provider at DENT had recommended ECT, which she was considering. Tr. 670-71. She also reported that "her depression has remained worse," but she was "stable at present." Tr. 671. On examination, Dr. Kolbert noted mildly flat affect, but Plaintiff was conversational, had good eye contact, she was pleasant and appropriate, and she denied any thoughts of hurting herself or others. Tr. 672.

On May 10, 2019, Plaintiff saw Sanjay Gupta, M.D. ("Dr. Gupta"), at DENT, for ECT consultation and treatment. Tr. 731-34. Plaintiff reported "emotional problems" since a young age, mostly characterized by depression. Tr. 731. She also reported symptoms of severe anxiety, including worry, trouble relaxing, and difficulty controlling worry and being nervous and on edge. *Id*. She reported that drinking was "not a good combination for her," which she described as "Mr. Jekyll and Hyde." *Id*. She reported that her paranoia that had worsened in February 2019, but it was "about 25% better" since starting Olanzapine. *Id*. Plaintiff told Dr. Gupta that she was a registered nurse and last worked at Blue Cross and Blue Shield, but she was "presently on disability." Tr. 732.

On MSE, Plaintiff described her mood as "severely depressed and anxious," but Dr. Gupta noted clear and coherent speech, intact judgment and insight, fair knowledge, and "delusions reduced with the Olanzapine." Tr. 733. Dr. Gupta also noted no manic or hypomanic symptoms and with goal-oriented and organized thought processes. *Id*.  Plaintiff's score on a PHQ-9 Patient Health Questionnaire ("PHQ-9") was 23 out of 27, indicating severe depression. *Id*. Dr. Gupta increased Plaintiff's Olanzapine dosage to 10 mg and increased Cymbalta to 90 mg per day. *Id*. He assessed that psychotherapy would be an important component of Plaintiff's treatment and

noted that Plaintiff was going to be seeing a psychotherapist soon. *Id*. He also noted that ECT treatment was deferred in favor of trying "medication manipulations," including considering Ketamine. *Id*.

On May 25, 2019, Plaintiff presented to the Emergency Department ("ED") at Erie County Medical Center ("ECMC"), complaining of increased depression, suicidal ideation and sleep problems, and thereafter, was evaluated by CPEP (Comprehensive Psychiatric Emergency Program) for crisis management. Tr. 689-702. She stated that she had not slept in 4-5 days and had been hearing whispering. Tr. 693. She admitted that her symptoms worsened after she drank ten 12-ounce beers at a bonfire and began feeling the increased symptoms. Tr. 697. She also reported increased alcohol use over the past 30 days, drinking 18 beers per a week, and admitted to using medical cannabis which she felt may have also been a contributing factor. Tr. 689, 693. Despite being tearful at times during triage, Plaintiff "maintain[ed] behavioral control" and remained calm and cooperative. *Id*. Tr. 693. Plaintiff's symptoms improved once she became sober, and she stated she didn't belong there. Tr. 693, 696, 699. After finding no acute psychiatric symptoms and no lethality concerns, Plaintiff received counseling regarding how alcohol and cannabis use could detrimentally impact her mood and was discharged home on May 27, 2024.  Tr. 697.

On June 3, 2019, Plaintiff presented to physician assistant Sydney Grabau, PA ("Ms. Grabau"), at DENT, for headaches and trigger point injections. Tr. 727-29. Ms. Grabau noted that Plaintiff had "a past medical history of Wolff-Parkinson-White syndrome status post cardiac ablations x 2." Tr. 728. Ms. Grabau also noted that Plaintiff had initially treated for headaches after a fall in January 2015, then returned in March 2018 after being lost to follow-up for nearly three years. *Id*. Plaintiff was last seen in March 2019 with worsening back pain. *Id*. At that time, she received trigger point injections and Medrol dose Pak and was certified for medical marijuana.  *Id*. Plaintiff reported improvement in back pain and stated injections and steroid pack were helpful.

*Id*. Plaintiff also reported she was trying to increase exercise by swimming, and she was taking medical marijuana about three days per week. *Id*. Ms. Grabau noted Plaintiff's recent admission to CPEP and stated that Plaintiff was continuing to follow closely with psychiatry. *Id*.

On July 3, 2019, Plaintiff had a follow-up evaluation with Mr. Asbach at DENT. Tr. 723-27. Plaintiff reported that despite taking Olanzapine, she continued to experience "emotional numbness and auditory hallucinations, as well as "experiencing high levels of anxiety and ruminative fears of impending death." Tr. 724. Plaintiff also reported that the recent increase in her Cymbalta dosage did not help. *Id*. Plaintiff told Mr. Asbach that Dr. Gupta "concluded that [she] did not require ECT," but recommended medication adjustments instead. *Id*. Mr. Asbach noted that prior to Plaintiff's admission to CPEP, she was under a great deal of stress due to "family drama." Tr. 725. On MSE, Plaintiff had depressed mood, diminished concentration, grossly intact memory and fund of knowledge, and fair insight and judgment. Tr. 726. Mr. Asbach believed ECT should be reconsidered, but there was concern for Plaintiff's heart function. *Id*. Plaintiff was planning to see her cardiologist the following week to discuss ECT candidacy. *Id*. Mr. Asbach increased Olanzapine dosage "to monitor if the auditory hallucinations and feelings of impending doom in the context of her depression resolve." *Id*.

On July 9, 2019, state agency review consultant Dr. Juriga opined that Plaintiff had moderate limitations in concentrating, persisting and maintaining pace; mild limitations in adapting and managing herself; and no limitations in understanding, remembering, or applying information and interacting with others, consistent with the capacity for simple work. Tr. 75.

Plaintiff was reevaluated by Mr. Asbach on September 3, 2019. Tr. 768-71. Plaintiff stated, "things have been difficult," and since her last appointment she had been having some "better days and some terrible days." Tr. 769. Her depressive symptoms had worsened to the point she "found it difficult to complete daily activities and [had] been isolating herself from others more

frequently." *Id*. Plaintiff reported that she been cleared by her cardiologist for ECT treatments, but she was awaiting clearance from her PCP. *Id*. She again reported difficulty sleeping and heard "whispering." Tr. 770. She admitted feelings of "wanting to die," but she "adamantly denied" having suicidal plan or intent. *Id*. MSE findings were unchanged, and Mr. Asbach increased her Olanzapine dosage. Tr. 771.

On November 27, 2019, state agency review consultant Dr. Ng opined that Plaintiff had moderate limitations in concentrating, persisting and maintaining pace; mild limitations in adapting and managing herself; and no limitations in understanding, remembering, or applying information and interacting with others. Tr. 94.

On February 6, 2020, Plaintiff had a follow-up visit with Dr. Capote at DENT. Tr. 1146-49. Plaintiff reported that "things [were] going poorly. Tr. 1146. She had been scheduled to start ECT but had to delay because she was attending to her father who had cancer at that time. *Id*. Plaintiff reported she had discontinued taking Olanzapine because "it was making her excessively sedated." *Id*. She reported her father was doing better, and she was ready to go forward with ECT. *Id*. She also reported she was "not currently involved with a psychotherapist at this time." Dr. Capote continued Cymbalta and started Abilify. Tr. 1148.

On March 6, 2020, Plaintiff had a preoperative examination with Mary Ilene Tarapacki, PA ("Ms. Tarapacki"), at BMG. Tr. 1252-58. Ms. Tarapacki cleared Plaintiff for the ECT procedure. Tr. 1258.

On April 30, 2020, Plaintiff had a telemedicine ("telemed") visit with Mr. Asbach, due to the COVID-19 pandemic. Tr. 1143. Plaintiff reported that she discontinued taking Abilify because she felt it "caused difficulties with feelings of emotional detachment and apathy." *Id*. Plaintiff reported that these feelings resolved when she stopped taking Abilify, but she once again started experiencing auditory hallucinations. *Id*. Plaintiff stated she could not obtain ECT therapy due to

the pandemic and she did not want to go to Brylin due to fear of exposure to COVID. *Id*. Mr. Asbach started Plaintiff on Latuda. *Id*. Mr. Asbach also noted that "[Plaintiff] would like to return to work at this time I am certainly supportive of this effort and I'm happy to provide a letter requesting that [she] be limited to 3 days a week." *Id*.

Plaintiff had a return telemed visit with Mr. Asbach on June 9, 2020. Tr. 1140-41. She reported that Latuda had helped reduce auditory hallucinations. Tr. 1040. Her depression had improved, but she continued to feel emotionally detached, and her anxiety symptoms remained, but they were relatively stable. *Id*. Mr. Asbach increased her Latuda dosage. Tr. 1141. On September 4, 2020, Plaintiff reported that her depression and anxiety were better, but still present. Tr. 1137-38. Mr. Asbach increased Plaintiff's Latuda dosage again. Tr. 1138.

On September 24, 2020, Plaintiff attended an ECT consult with Ramesh Konakachi, D.O. ("Dr. Konakachi"), at Brylin Hospitals ("Brylin"). Tr. 1280-81. Plaintiff stated: "I need to try something different." Tr. 1280. Dr. Konakachi noted Plaintiff's history of depression and "questionable bipolar disorder" and observed that any hypomanic symptoms had not been present for some time. *Id*. He also noted that Plaintiff had obtained only marginal improvement over time from antidepressants and "atypicals."[4] *Id*. Plaintiff denied any suicidal or homicidal ideation, plan, or intent, and denied any type of hallucinations or delusions. *Id*.  Dr. Konakachi noted that Plaintiff would need medical clearance, including from cardiology, before moving forward with ECT. Tr. 1281.

On September 30, 2020, Plaintiff underwent a mental health assessment at BestSelf Behavioral Health ("BestSelf"). Tr. 1332-49. She reported that she was going to be cleared for

---

[4] "Atypicals" refers to a class of medications that help relieve symptoms of obsessive-compulsive disorder in people who do not respond to antidepressant medication alone. These medications are prescribed because they have a lower risk of serious side effects than conventional antipsychotic medications. *See* NYU Langone Health website, https://nyulangone.org/anxiety-disorders/treatments (last visited Apr. 23, 2024).

ECT, but her doctors at DENT "wanted her to do counseling along with it." *Id*. She reported symptoms including depressed mood, frequent crying, suicidal ideation, feeling detached, auditory hallucinations, trouble falling asleep, excessive worry, and rumination. *Id*. Plaintiff reported that she was currently drinking once per week, but from April to June, she had been drinking three to four times per week. Tr. 1335. She reported drinking on average seven beers per sitting and was assessed with "mild" alcohol use disorder. *Id*.

On MSE, she had depressed mood, reported auditory hallucinations, demonstrated concrete thinking, and reported trouble falling asleep. Tr. 1340-41. She reported suicidal ideation, stating that she recently walked across a bridge and thought about jumping off. Tr. 1343. Plaintiff also reported that on the occasion when she was admitted to CPEP, her husband found her sitting with a knife. *Id*. She was diagnosed with major depressive disorder, recurrent episode, severe. Tr. 1354. Plaintiff continued treating at BestSelf on October 9, 2020 (Tr. 1359-60), November 13, 2020 (Tr. 1371-72), and November 25, 2020 (Tr. 1374), with no significant changes in MSE findings noted.

As noted above, Plaintiff challenges the ALJ's mental RFC finding. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15,

14

2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the

sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Plaintiff filed her application on March 20, 2019, and therefore, the 2017 regulations are applicable to her claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings. The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the ALJ focuses on the persuasiveness of the medical opinion(s) or prior administrative medical finding(s) using the following five factors: (1) Supportability; (2) Consistency; (3) Relationship with the claimant (which includes: (i) Length of the treatment relationship; (ii) Frequency of examinations; (iii)

Purpose of the treatment relationship; (iv) Extent of the treatment relationship; and (v) Examining relationship); (4) Specialization; and (5) Other factors. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the

Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Contrary to Plaintiff's contentions, the ALJ in this case properly analyzed the opinion evidence and the other evidence of record when developing Plaintiff's RFC, and substantial evidence supports the ALJ's RFC finding that Plaintiff could perform sedentary work, with additional postural, environmental, and mental limitations. Tr. 19. In making this determination, the ALJ considered the objective medical evidence and other evidence in accordance with 20 C.F.R. § 416.929 and SSR 16-3p, as well as the opinion evidence in accordance with the requirements of 20 C.F.R. § 416.920c.

Plaintiff argues that "the ALJ erred in failing to either reach out to treating sources to get a functional treating opinion or order a consulting examination." *See* ECF No. 6-1 at 16-17. Contrary to Plaintiff's argument, however, the ALJ was not required to rely upon any medical opinion, examining or otherwise. As the Second Circuit recently reiterated, the RFC does not need to exactly correspond to a particular medical opinion. *Schillo v. Kijakazi*, 31 F.4th 64, 77-78 (2d Cir. Apr. 6, 2022) (affirming where the ALJ declined to adopt the limitations set forth in three treating source opinions, and the RFC finding did not match any opinion in the record). Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56).

Furthermore, there is no requirement that an ALJ's RFC finding be based on a medical opinion at all. *See, e.g.*, *Corbiere v. Berryhill*, 760 F. App'x 54, 56-57 (2d Cir. 2019) (summary order) (affirming ALJ's physical RFC assessment based on objective medical evidence); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (affirming where ALJ rejected sole medical opinion in record speaking to mental); *John H. v. Comm'r, Soc. Sec.*, No. 1:20-CV-921-DB, 2021 WL 2355107, at *4 (W.D.N.Y. June 9, 2021) ("Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional"); *see also Bliss v. Comm'r of Soc. Sec.*, No. 10-1558, 406 F. App'x 541, 542 (2d Cir. 2011) ("[T]he ALJ need not involve medical sources or claimant's counsel in his deliberative process or assessment of the evidence"); *Julie W. v. Comm'r of Soc. Sec.*, No. 20-CV-01042, 2021 WL 6064389, at *7 (W.D.N.Y. Dec. 22, 2021) ("an RFC may be supported by substantial evidence, even if it does not correspond to any particular medical opinion") (internal citations omitted).

Moreover, the regulations explicitly state that the issue of RFC is "reserved to the Commissioner" because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ "will assess your residual functional capacity based on all of the relevant medical and other evidence," not just medical opinions. 20 C.F.R. § 404.1545(a); 20 C.F.R. §§ 404.1513(a)(1), (4), 416.913(a)(1), (4) (explaining that evidence that can be considered includes objective medical evidence, such as medical signs and laboratory findings; as well as evidence from nonmedical sources, including the claimant, such as from forms contained in the administrative record). Thus, opinion evidence is only one type of evidence an ALJ is required to consider. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) ("we will assess the residual functional capacity based on all the relevant medical and other evidence in your case record"); *Matta*, 508 F. App'x at 56 ("Although the ALJ's conclusion may not perfectly correspond with

any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").

In this case, the ALJ relied on a variety of evidence to support his mental RFC finding, including opinion evidence, Plaintiff's treatment records, and her reported activities of daily living. Notwithstanding the fact that the ALJ was not required to rely upon a medical opinion, the ALJ nevertheless relied on three such opinions. First, the ALJ was persuaded by findings of state agency psychologists Drs. Juriga and Ng, who reviewed the evidence in the record on July 9, 2019, and November 27, 2019, respectively. Tr. 23, 75-76, 94-95. Dr. Juriga and Dr. Ng both found that Plaintiff had no limitation in her ability to understand, remember, and apply information; no limitation in her ability to interact with others; a moderate limitation in her ability to concentrate, persist, or maintain pace; and a mild limitation on her ability to adapt or manage herself. Tr. 75, 94.

Plaintiff claims that the ALJ was wrong to have relied on the findings of Drs. Juriga and Ng because they did not examine Plaintiff (*see* ECF No. 6-1 at 17), but this is contrary to the Commissioner's regulations. *See* 20 C.F.R. § 404.1513a(b)(1) (recognizing that state agency psychologists, such as Drs. Juriga and Ng, are highly qualified and experts in Social Security disability evaluations); *see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)). Thus, the opinions of non-examining state agency consultants may provide substantial support for the RFC finding. *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (explaining that, even the former regulations which gave ALJs far less deference, permitted the opinions of non-examining sources to override the opinions of the claimant's own sources provided they are supported by the evidence in the record (internal citations omitted); *see also Kidd v. Comm'r of Soc. Sec.*, No. 18-CV-217-FPG, 2019 WL 1260750, at *5 (W.D.N.Y. Mar. 19, 2019) (quoting *Barber v. Comm'r of Soc. Sec.*, No. 6:15-CV-0338-

GTS/WBC, 2016 WL 4411337, at *7 (N.D.N.Y. July 22, 2016) (citations omitted) ("It is well established that an ALJ may rely on the medical opinions provided by State agency consultants and that those opinion[s] may constitute substantial evidence."); *Cheatham v. Comm'r of Soc. Sec.*, No 1:17-cv-0782-WMC, 2018 WL 5809937, *6 (W.D.N.Y. 2018) ("[n]on-examining medical consultants, like Dr. Gross, may provide opinions which constitute substantial evidence").

As the ALJ explained, he found Dr. Juriga and Dr. Ng's assessments of "moderate" limitations in maintaining attention and concentration for extended periods, completing a normal work schedule, and performing at a consistent pace persuasive because they were supported by, and consistent with, the evidence in the record. Tr. 20, 23. *See* 20 C.F.R. § 404.1520c(c)(1) (explaining that in evaluating medical opinions, the more a medical source presents relevant objective evidence and supporting explanations to support his or her opinion, the more persuasive that opinion will be found); see 20 C.F.R. § 404.1520c(c)(2) (explaining that the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be found).

The ALJ also explained that he found the state agency consultants' assessment that Plaintiff had a moderate restriction in concentration more consistent with the evidence in the record, and therefore, more persuasive than Dr. Reid's opinion of a mild limitation. Tr. 23. In so finding, the ALJ considered Plaintiff's assessment of "mild" alcohol use disorder and some occasional "vague" assessments of diminished concentration in the treatment notes. Tr. 20-21, 23. The ALJ also explained that he afforded "extreme deference" to Plaintiff's subjective complaints and her "allegations of poor stress management, fatigue, variable mood, reliance upon her husband, headaches, and even fibromyalgia." Tr, 23. The ALJ found that this evidence was more in line with the assessments of Drs. Juriga and Ng than with the assessment of Dr. Reid and reasonably concluded that Plaintiff retained the capacity to "perform simple work tasks but would require a

low stress work environment, defined as having only occasional decision [-]making and changes in work setting." Tr. 23, 75, 94, 1400.

The ALJ also appropriately considered Plaintiff's mental health treatment notes when assessing the RFC. Tr. 21-23. As the ALJ highlighted, Plaintiff's treatment notes reflected depressed mood and diminished concentration on occasion; but, on other occasions, her concentration was appropriate and her mood was normal; moreover, her demeanor was consistently cooperative, her memory was intact, her fund of knowledge was unimpaired, her psychomotor activity was normal, her sensorium was alert, her orientation was full, her speech was clear and coherent, her attire was appropriate, her insight and judgment were fair or good, and her thoughts were goal directed. Tr. 21-23, 654, 660, 671-72, 692, 695, 708, 710, 729, 733, 771, 775, 779, 1138, 1141, 1144, 1248, 1340.

The ALJ also noted that while Plaintiff's treatment records revealed that she occasionally complained of paranoia and auditory hallucinations of hearing "whispers," she also admitted that excessive alcohol consumption had worsened her symptoms and compromised her ability to adapt or manage. Tr. 20, 22, 731,733, 770. Plaintiff also admitted that marijuana led to increased paranoia and hearing "whispers." Tr. 692, 707. In May 2019, she specifically reported that she drank ten 12-ounce beers at a bonfire when she felt a worsening of her symptoms, stating that "it just kind of came out, all that stress," and she felt suicidal. Tr. 22, 692, 712. In September 2020, she reported that from April to June she had been drinking three to four times per week, about seven beers in a sitting. Tr. 22, 1335. She also stated that drinking initially made her feel better, but then it would make her feel more depressed. Tr. 1336.

The ALJ also properly considered Plaintiff's improvement with treatment. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (improvement with treatment is properly considered in concluding claimant not disabled); *Rivera v. Colvin*, No. 1:14-CV-00816 (MAT),

2015 WL 6142860, at *6 (W.D.N.Y. Oct. 19, 2015) (citing *Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2014)) (ALJ may consider conservative treatment); *see also* 20 C.F.R. § 416.926a(a)(3) (ALJ must consider the effects of medications or other treatment on a claimant's ability to function). As the ALJ explained, Plaintiff reported that medication was helping her paranoid delusions, her auditory hallucinations, and her depression and anxiety. Tr. 21, 731, 769, 1137. On September 4, 2020, Plaintiff reported that "things have been better" and she was "handling things well through the corona virus." Tr. 1137. Thus, Plaintiff's improvement in her symptoms with medication undermines her allegation of disability. *See Matta*, 508 F. App'x at 57 (treatment notes showing plaintiff being stable and responsive treatment supported the ALJ's conclusion that despite suffering from a bipolar disorder, plaintiff could perform work on a regular and continuing basis).

In addition, the ALJ noted that Plaintiff's treatment records showed that she did not always comply with treatment. Tr. 21-22. The ALJ noted that Plaintiff had been cleared for ECT therapy but failed to start it for various reasons, including getting "cold feet" (Tr. 784); being afraid of exposure to the COVID (Tr. 1143); and taking care of her father when he became ill with cancer (Tr. 1249). Tr. 21. The ALJ also noted that Plaintiff "self-ceased" taking her prescribed psychiatric medications, including Olanzapine because she alleged "it was making her excessively sedated," even though in the past she indicated that she was "tolerating [her medications] well," which included Olanzapine, Tr. 22, 769, 771, 774. In April 2020, Plaintiff reported that she had discontinued taking Abilify. Tr. 1143. In September 2020, she admitted that she "disengaged from treatment or began to decline her medication in the past she had stopped getting treatment or taking her medication if she had started to feel better." Tr. 1343.

In March 2019, Plaintiff also reported that she had been evaluated at Suburban in 2017 but did not follow up with treatment. Tr. 22, 784. As the ALJ noted, Plaintiff was again advised to

undergo psychotherapy in May 2019, but there is no evidence that she saw a therapist until September 30, 2020. Tr. 22-23, 733, 1290, 1393. Based on the foregoing, the ALJ reasonably found that Plaintiff's repeated non-compliance with treatment undermined her allegation of disability. Tr. 22. *See* SSR 16-3p, 2017 WL 5180304 *9 (explaining that if the individual fails to follow prescribed treatment that might improve symptoms, the ALJ may find that the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence in the record); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (noting that Dumas was unwilling to help himself by following treatment recommendations and remarking, "[o]f course, a remediable impairment is not disabling").

In addition to relying on the foregoing medical evidence, the ALJ also properly relied on Plaintiff's activities of daily living when he determined her RFC. Tr. 15, 18, 22, 42, 221. *See* 20 C.F.R. § 404.1529(c)(3)(i) (An ALJ may consider the nature of a claimant's daily activities in evaluating the consistency of allegations of disability with the record as a whole.); *see also Ewing v. Comm'r of Soc. Sec.*, No. 17-CV-68S, 2018 WL 6060484, at *5 (W.D.N.Y. Nov. 20, 2018) ("Indeed, the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms.") (citing 20 C.F.R. § 416.929(c)(3)(i)). The ALJ noted that Plaintiff returned to work part-time as a nurse for part of the relevant period, and although the ALJ found this work was not substantial gainful activity, he nonetheless appropriately considered it in determining that Plaintiff retained the ability to work. Tr. 15-16, 18, 216, 343. *See* 20 C.F.R. § 404.1571 (even if the work a claimant had done was not substantial gainful activity, it may show that the claimant can do more work than she actually did); *Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008) (while claimant's work during the relevant period did not meet the threshold for substantial gainful activity, he worked at levels consistent with light work); *Cabrero-Gonzalez v. Colvin*, No. 13-CV-6184-FPG, 2014 WL

7359027, at *19 (W.D.N.Y. Dec. 23, 2014) (ALJ appropriately discredited claimant's allegations in part because he worked after his alleged disability onset date).

In addition, the ALJ noted that Plaintiff was also able to attend to a variety of activities of daily living, including socializing with others, such as at the bonfire where she had been drinking. Tr. 22, 692, 697. Plaintiff also performed household chores, such as cooking (Tr. 283, 756); heavy housework, "such as scrubbing floors or lifting or moving furniture" (Tr. 1252); and she drove and shopped (Tr. 282, 789, 729, 733). She also took care of her personal grooming (Tr. 756); helped take care of her dogs (Tr. 281); and exercised, sometimes daily, by walking (Tr. 729, 733, 786), indicating that she had the motivation to do so.

The ALJ reasonably found that these activities indicated that Plaintiff could do simple, routine tasks in a low-stress environment. Tr. 22. *See Kenneth W. v. Comm'r of Soc. Sec.*, No. 1:19-cv-0825-WBC 2020 WL 7385251, at *6 (W.D.N.Y. Dec. 16, 2020) (mental RFC for simple work, in a low stress environment, with occasional contact with others, was supported by plaintiff's activities of attending to his personal hygiene, preparing simple meals, performing household chores, visiting with friends, shopping, fishing, handling finances, watching television, caring for his pet, maintaining treatment appointments, and taking public transportation); *Cheatham*, 2018 WL 5809937, at *10 (ALJ's determination that plaintiff could maintain attention and concentration for simple, routine, repetitive tasks and interact to some degree with others is supported by plaintiff's activities, which included using public transportation, preparing meals, cleaning, shopping and playing basketball).

Ignoring the substantial evidence outlined above, Plaintiff instead argues that the ALJ improperly relied upon the findings of Drs. Juriga and Ng because (according to Plaintiff) Drs. Juriga and Ng mischaracterized the evidence they cited in support of their assessments. *See* ECF No. 6-1 at13-14. Essentially, Plaintiff is arguing that Drs. Juriga and Ng, as well as the ALJ in

relying on their findings, engaged in cherry-picking because they focused on the normal evidence in the treatment records and ignored evidence showing limitations. *See id.* Plaintiff's argument is without merit. Contrary to Plaintiff's argument, Dr. Juriga and Dr. Ng correctly highlighted Plaintiff's normal examination findings from March 28, 2019, and May 20, 2021 (Tr. 75, 81, 660, 695), and Dr. Ng, who reviewed additional evidence submitted after Dr. Juriga's assessment, also correctly highlighted Plaintiff's normal findings from September 3, 2019 (Tr. 81, Tr. 771). *See Angelo C. v. Comm'r of Soc. Sec.*, No. 20-CV-1579-A, 2022 WL 682654, at *6 (W.D.N.Y. Mar. 8, 2022) (finding that an ALJ does not engage in cherry-picking when he highlights evidence that illustrates a point supporting his non-disability finding); *see also Matos v. Comm'r of Soc. Sec.*, No. 18-CV-4701 (BMC), 2019 WL 4261767, at *1 (E.D.N.Y. Sept. 9, 2019) ("[T]he accusation of improper 'cherry-picking' . . . is a two-way street.").

Although Plaintiff cites some evidence which she contends Drs. Juriga and Ng failed to consider, the fact that the evidence may have been weighed differently, or that there may be a reasonable interpretation of the evidence in Plaintiff's favor, is not probative. *Caron v. Colvin*, 600 F. App'x 43, 44 (2d Cir. 2015). For example, contrary to Plaintiff's argument, Drs. Juriga and Ng did not ignore the finding from March 28, 2019 that Plaintiff had diminished concentration. *See* ECF No. 6-1 at 13 (citing Tr. 660. Rather, Drs. Juriga and Ng found that Plaintiff had a moderate limitation in concentration, persistence, and maintaining pace (Tr. 75, 81), which (as noted previously) the ALJ found persuasive and incorporated into the RFC by restricting Plaintiff to simple and routine work. Tr. 19.

Drs. Juriga and Ng also did not ignore Plaintiff's March 28, 2019 report that she experienced murmuring and indistinguishable voices. *See* ECF No. 6-1 at 13 (citing Tr. 658). Plaintiff fails to mention that on actual examination there was no evidence of hallucination or delusion. Tr. 660. Thus, Drs. Juriga and Ng did not mischaracterize any examination findings made

on March 28, 2019, as Plaintiff alleges. Moreover, as discussed above, the ALJ discussed treatment records indicating that Plaintiff occasionally complained of hearing "whispers" but noted that these symptoms were worsened by excessive alcohol consumption and marijuana use. Tr. 20, 22, 692, 707, 731,733, 770.

With respect to Plaintiff's claim that Drs. Juriga and Ng ignored that Plaintiff was admitted to CPEP on May 20, 2019, with thoughts of suicide, Plaintiff, herself, again mischaracterizes the state agency doctors' findings. *See* ECF No. 6-1 at 13, Notably, when Plaintiff presented complaining of suicidal ideation, she once again had mostly normal examination findings, except for some depression and limited insight and judgment. Tr. 75, 81, 695. While she again reported her history of hearing whispers, on examination, she denied having visual, auditory, command, olfactory, or tactile hallucinations. Tr. 692, 695. Further, Dr. Juriga and Dr. Ng specifically noted that Plaintiff presented to CPEP acknowledging thoughts of suicide after drinking ten beers at a bonfire the night before, but she denied any plan, intent, or attempt, and she declined to complete a safety plan, stating "I know what to do if I need help." Tr. 75-76, 81.

Plaintiff similarly complains that Drs. Juriga and Ng ignored evidence that she was tearful during her CPEP triage examination. *See* ECF No. 6-1 at 13 (citing Tr. 693). But again, it is Plaintiff who mischaracterizes the evidence. Plaintiff fails to mention that, despite being tearful at times during the encounter, she "maintain[ed] behavioral control," remained calm and cooperative, and her symptoms improved once she became sober. Tr. 693, 696, 699. Furthermore, the ALJ specifically acknowledged that Plaintiff was tearful on some occasions, but he noted that this symptom was mentioned infrequently in the administrative record and other evidence showed that Plaintiff's behavior remained normal and her other mental status findings were normal. Tr. 18. Plaintiff does not explain how the cited treatment records indicate that she had additional restrictions beyond those set forth by the ALJ, as was her burden to show. *Parker v. Berryhill*, No.

27

17-cv-252-FPG, 2018 WL 4111191, at *4 (W.D.N.Y. Aug. 29, 2018) (holding that plaintiff bears the burden of showing that the RFC is more limited than that found by the ALJ); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC.").

In sum, there is no merit to Plaintiff's contention that Dr. Juriga and Dr. Ng, and relatedly the ALJ, mischaracterized the evidence. Rather, the ALJ's RFC findings reflect a reasonable interpretation of the entire record, including the opinions of Drs. Juriga and Ng, as well as other sources in the administrative record, such as treatment records and Plaintiff's activities of daily living. Using these opinions and data points, the ALJ reasonably laid out with specificity Plaintiff's mental capabilities. *See, e.g.*, *Schillo*, 31 F.4th at 78. Plaintiff, on the other hand, focuses on a few positive symptoms (such as tearfulness, passing suicidal thoughts, and reports of hearing whispering) and ignores most normal findings recounted above. As such, it is Plaintiff herself who does what she accuses the ALJ of doing—picking the cherries.

While Plaintiff may prefer a different interpretation of the evidence, the substantial evidence standard of review focuses on the ALJ's findings, not the alternative findings that Plaintiff would prefer. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."); *see also Barrere v. Saul*, 857 F. App'x 22, 24 (2d Cir. 2021) (noting that where "there is substantial evidence to support either position, the determination is one to be made by the factfinder"). Accordingly, the ALJ's mental RFC finding was supported by substantial evidence, and the Court finds no error.

In her final argument, Plaintiff asserts that the ALJ should have solicited a functional medical opinion from a treating or examining source. *See* ECF No. 6-1 at 17). Plaintiff's argument fails for several reasons.   An ALJ's duty to develop the record, even where Plaintiff was

represented, as here, is "generally affirmative," arising from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination. *See Perez v. Chater*, 77 F.3d. 41, 47 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d), (e)12) (other citation omitted); *see also Pratts v. Chater*, 94 F.3d 34, 47 (2d Cir. 1996) (same). Therefore, the Commissioner's regulations require the agency and/or the ALJ, to develop Plaintiff's "complete medical history," or "the records of his medical [or treating] source(s)," by making "every reasonable effort to help [Plaintiff] get medical evidence from" such treating sources. 20 C.F.R. § 404.1512(b)(1)(i)-(ii)).

Nevertheless, an ALJ's duty to develop the record is not limitless. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34. Most basically, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996); *see also* 20 C.F.R. §§ 404.1520b(b)(1), 416.920b(b)(1)-(2) (If the evidence is incomplete or inconsistent but sufficient for the ALJ to make a decision, she will make a decision based on the existing evidence); *Rosa*, 168 F.3d at 79 n.5 (citing *Perez* v, 77 F.3d at 48) ("Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."); *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. Jan. 8, 2015) (summary order) (although an ALJ has a duty to develop the record, where there are no obvious gaps and the ALJ possesses a complete medical history, he is under no obligation to seek a treating-source opinion (citations omitted));

First, the record reflects that the ALJ attempted to develop the record at the November 24, 2020 hearing by inquiring about any missing evidence. Tr. 40. After Plaintiff's attorney identified some missing evidence and offered to request and submit it, the ALJ left the record open until

December 22, 2020. Tr. 42. Thereafter, Plaintiff's attorney submitted additional evidence from BryLin Hospital, dated September 24, 2020) (Tr. 1278-83); and from BestSelf, dated September 29, 2020, to November 25, 2020) (Tr. 1284-1380). If Plaintiff's attorney wanted to submit an opinion from one of Plaintiff's treating sources, the attorney had the opportunity to do so when the ALJ left the record open, but the attorney did not. The Court notes that even had such a treating source opinion been submitted, under the new regulations, such an opinion would not warrant any special deference. *See* 20 C.F.R. § 404.1520c(a).

In any event, by providing Plaintiff's counsel the opportunity to obtain and submit evidence, the ALJ properly discharged his duty to develop the record. *See Melton v. Colvin*, No. 13-CV-6188, 2014 WL 1686827, at *8 (W.D.N.Y. Apr. 29, 2014) (holding that ALJ satisfied duty to develop the record by holding the record open after the hearing) (collecting cases); *Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) ("Courts do not necessarily require ALJs to develop the record by obtaining additional evidence themselves, but often permit them to seek it through the claimant or his counsel.") (citations omitted)); *Torres v. Colvin*, 12 Civ 6527-ALC, 2014 WL 4467805 at *6 (S.D.N.Y. Sept. 8, 2014) (noting that the ALJ's duty to develop the record "is not without limit" and finding that the ALJ satisfied the duty where he left the record open for counsel to submit additional evidence).

Plaintiff also contends that the ALJ was obligated to "reach out to [Mr.] Asbach for clarification of Plaintiff's functional abilities," based on Mr Asbach's April 30, 2020 assessment limiting Plaintiff to working only three days per week (Tr. 1143). *See* ECF No. 6-1 at 14. However, the Commissioner's regulations afford the ALJ discretion to determine how to develop the record. The ALJ "*may* recontact" a medical source when the evidence in the record is either incomplete or inconsistent. *See* 20 C.F.R. § 404.1520b(b)(2)(i) (emphasis added). Thus, there is no absolute obligation or duty to recontact a treating source under the regulations. Furthermore, an ALJ is free

to reject a medical source opinion without needing to recontact the source for clarification. *See Schillo*, 31 F.4th at 78 ("Schillo contends that the ALJ was duty bound to obtain a more detailed and clarified statement from Dr. Shukri before rejecting statements due to vague, undefined terms. We disagree.") (internal quotations omitted). Accordingly, the ALJ had no obligation to contact Mr. Asbach and request clarification, particularly where the ALJ specifically noted that Mr. Asbach's assessment was not persuasive because it lacked any justification or supportive clinical evidence. Tr. 23, 1143.

The regulations also permit the ALJ to develop the record in other ways, such as by asking the claimant to undergo a consultative examination or asking the claimant or others for more information. 20 C.F.R. § 404.1520b(b)(2)(i). In this case, the ALJ elected to go with the latter option by seeking additional evidence from medical expert Dr. Reid to develop the record. *See* Tr. 1381. As previously explained, there is no requirement for the ALJ to provide the claimant with a consultative examination. The decision of whether to order a consultative examination is entirely within the ALJ's discretion. *See* 20 C.F.R. § 404.1519(b) (providing that an ALJ may order a consultative examination if necessary to resolve an inconsistency in the evidence or when the evidence is insufficient to make a determination on the claim).

Here, the ALJ reasonably determined that the record was sufficiently developed to make a disability decision. Plaintiff's medical records spanned several years, with treatment notes from multiple providers and multiple medical opinions, as well as Plaintiff's own statements about her activities of daily living. Accordingly, the ALJ was not obligated to follow up with any other provider for greater clarity. *See Schillo*, 31 F.4th at 76 (because "there was a complete record before the ALJ consisting of medical opinions, treatment notes, and test results from 2016 to 2018, as well as [claimant]'s own testimony," the ALJ was not under obligation to pursue more information from a particular physician). Accordingly, the Court finds no error.

As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in original). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do. As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## **CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 7) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE